[No. F026000. Fifth Dist. Nov. 7, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
$48,715 UNITED STATES CURRENCY et al., Defendants;
CANDELARIO ANGULO PEREZ, Defendant and Appellant.

1508

COUNSEL

Carlos Holguin and Andres Z. Bustamante for Defendant and Appellant.

Edward R. Jagels, District Attorney, and Michael J. Yraceburn, Deputy District Attorney, for Plaintiff and Respondent.

OPINION

VARTABEDIAN, J,—Candelario Angulo Perez appeals from a summary judgment of forfeiture pursuant to Health and Safety Code section 11470 et seq.[1] (See § 11488.5, subd. (c)(3); Code Civ. Proc., § 437c.) Appellant contends his motion to suppress evidence should have been granted and that respondent failed to establish, at the hearing on appellant's motion for return of the seized property, probable cause to believe the property, approximately $80,000 in cash, was forfeitable. We affirm.

*Facts and Procedural History*

On July 30, 1995, appellant was a passenger in a 1995 Dodge Ram pickup truck headed south on Highway 99 near Bakersfield. The bed of the truck was loaded with luggage and bags of pasture seed. Appellant's brother owned the truck, which was registered in the state of Sinaloa, Mexico, and bore license plates from that state.

The truck was overloaded, causing the rear axle to break. One of the rear wheels sheared off, and the disabled truck came to a stop in the center divider. By the time a tow truck arrived, it was about 9 p.m. The driver of the pickup, Nieblas, spoke with the tow truck driver, Christopher Dodd. He offered Dodd double the price if he could find someone to fix the truck immediately so the men could return to Mexico that night. Nieblas said cost was no object. Dodd became suspicious that the men were transporting narcotics; he asked his dispatcher to summon a deputy sheriff to the scene.

Kern County Deputy Sheriff Robert Stevenson arrived at the disabled pickup about a half hour later. He talked with Dodd, then determined Nieblas was the only one of the three men in the pickup who spoke enough English to communicate with Stevenson. According to Stevenson's incident report, he looked at Nieblas's California driver's license and returned it to him. He told Nieblas he suspected the pickup might be carrying narcotics.

---

[1]All further statutory references are to the Health and Safety Code except as otherwise indicated.

He asked if Nieblas "would . . . mind if I searched it. [He] said he had no problem with me searching the vehicle." When Stevenson saw that the bed of the truck was full, he told the men (with Nieblas translating for appellant and the other passenger, Para) the search "might take a while and would he mind sitting in the back of my car. [Nieblas] complied, and in fact helped me translate to the other two subjects to come over to my vehicle to sit in the car." Stevenson asked the three men if he could search them for any possible weapons. "All three gentlemen complied," according to the incident report.[2] The patdown revealed a cellular telephone and $700 in appellant's pockets.

After inspecting the pickup further, Stevenson decided a canine search would be more expeditious. Again, he sought permission from the three men, who said they "didn't mind waiting at all" while Stevenson called for a drug dog. Deputy Jess Baker was dispatched to the scene with his trained dog, Enzo. Baker concluded it would be dangerous to release Enzo at night in the middle of a busy freeway. Accordingly, Baker, who speaks Spanish, asked the three men for permission to move the pickup to a truck stop a few miles down the highway so Enzo could examine the vehicle. Appellant and the other two men agreed.

At the truck stop, Enzo alerted to a seed bag and two suitcases, which were opened by the deputies but revealed nothing of interest. Then Enzo alerted to the sides of the truck bed. The deputies looked between the bed liner and the side of the truck. The deputies saw bundles they thought contained illegal drugs and they called for narcotics squad backup. On further inspection behind the bed liner, the deputies discovered on one side taped bundles containing $48,715, mostly in $20 bills. On the other side, they found similar bundles containing $29,992.

Deputy J.R. Rodriguez, assigned to the narcotics squad, confirmed with appellant that appellant had no objection to the continuation of the search. Rodriguez then found another cellular telephone under the seat of the truck. Appellant said it belonged to one of the other men. Rodriguez asked appellant if he would allow the pickup to be transported to the sheriff's substation for a more thorough search. Appellant agreed.

At the substation, Rodriguez informed the men they were not in custody and would not be arrested. He interviewed them concerning the money found in the truck. Nieblas and Para denied any of the money was theirs and signed

---

[2]According to declarations submitted by appellant, Nieblas and Para, Stevenson did not ask for consent to search the pickup. Instead, he checked Nieblas's driver's license, ordered all three men into the patrol car, then subsequently told Nieblas he was going to search the truck. The men denied they gave permission for any of the searches at any time.

disclaimers to that effect. Nieblas said he was on probation for possession of heroin for sale.

Appellant said $30,000 of the cash was his. He said he brought it into the country two weeks previously to buy a farm tractor. He could provide no further details concerning his prospective purchase, except that he intended to buy a "Deere." He said the remainder of the money had been given to him by a friend to buy additional farm equipment if he found a bargain. Rodriguez told the men to come back the next day to reclaim the pickup, but that forfeiture proceedings would be instituted with respect to the currency found in the bed of the truck. A deputy took the men to a motel.

The next day, appellant and the other two men reclaimed the pickup. They were served with a petition for forfeiture of the currency the same day, July 31, 1995. Appellant and the other two men filed a verified claim opposing forfeiture on August 28, 1995.

On November 17, 1995, appellant (the other two men having dropped out of the case) filed a motion for return of property and to suppress evidence. The motion contended there was no probable cause the currency was subject to forfeiture and that the "evidence the People intend to use in support of their petition to forfeit defendant's property was illegally seized in violation of the Fourth and Fifth Amendments to the United States Constitution and cannot be introduced into evidence."

At the December 8, 1995, hearing on the motion, the trial court received into evidence declarations of appellant and his two companions, the declarations of the deputy sheriffs involved in the case, and their incident reports. The court found Nieblas initially had given consent to the search of the pickup. Next, the court ruled the three men had been unlawfully detained, so that subsequent consents to search and to remain with the deputies were tainted and invalid. However, the original consent, concluded the court, was of sufficient scope that the ensuing removal of the pickup, search by the dog, and recovery of the currency were lawful under the Fourth Amendment. The court also decided there was probable cause to seize the currency.

On March 19, 1996, the trial court granted the People's motion for summary judgment of forfeiture of the currency, based primarily on facts established through requests for admissions and other discovery. Appellant filed a timely notice of appeal on May 8, 1996.

## Discussion

Appellant raises two broad issues on this appeal. The first contention is that the currency was discovered and seized pursuant to an unlawful search.[3] The second general contention is that respondent failed to demonstrate, at the hearing on the motion for return of property, probable cause to seize the currency.[4]

 Appellant does not contend the original consent by Nieblas was ineffective. Rather, he claims the consent terminated as a matter of law when appellant was unlawfully detained immediately after the consent was given and he contends the search that actually occurred was far in excess of the search to which Nieblas consented.

Acknowledging that no California case holds that a subsequent unlawful detention terminates a previous consent to search as a matter of law, appellant nonetheless contends *U.S.* v. *Ibarra* (10th Cir. 1992) 955 F.2d 1405, 1411, supports his position. He also asserts a prior consent should terminate under the rule that a consent given *after* an unlawful detention is normally invalid.

In *U.S.* v. *Ibarra, supra,* 955 F.2d 1405, defendant was stopped for suspected drunk driving and consented to a search of his car's trunk. The officer completed the search, finding nothing suspicious. The officer ticketed defendant for driving on an expired license, determined the passenger's license had also expired, and caused defendant's car to be towed to an impound lot until defendant could obtain a licensed driver to take the car

---

[3]The parties agree that forfeitability may not be proved with unconstitutionally obtained evidence. (See *People* v. *Superior Court (Moraza)* (1989) 210 Cal.App.3d 592, 598-599 [258 Cal.Rptr. 499].) Contrary to appellant's contention at oral argument, illegally seized evidence can be the subject of forfeiture. (*Ibid.*)

[4]We note respondent raises a contention that they should prevail at the outset because the court erred in concluding there was any detention at all. We find it unnecessary to address this argument in light of our ultimate conclusion that the trial court correctly found that all of the relevant search activity here was within the scope of Nieblas's initial consent, even if later consents were the tainted result of an illegal detention.

Respondent did not initially challenge the cognizability of these issues on appeal. We requested supplemental briefing on the issue. With respect to the probable cause contention, we think it is probably not cognizable after a full determination on the merits of the forfeiture petition without a showing of prejudice, absent here. (See *Waller* v. *TJD, Inc.* (1993) 12 Cal.App.4th 830, 833-834 [16 Cal.Rptr.2d 38]; *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529-530 [165 Cal.Rptr. 851, 612 P.2d 941].) Given the Fourth Amendment basis of the search and seizure issue, cognizability of that issue may be more likely. Because the parties have provided full briefing on the merits, we determine the appeal on its merits and not on the "close and difficult" issue of cognizability. (*People* v. *Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93].)

away. Defendant and the passenger were transported into town and released. (*Id.* at p. 1407.) The officer then went to the impound lot and searched defendant's car again. He found cocaine hidden in the trunk. (*Id.* at p. 1408.)

The Court of Appeals concluded that towing the car to the impound lot constituted an illegal seizure of the car. (955 F.2d at p. 1411.) The court then concluded the initial consent to search the trunk of the car did not continue after the illegal seizure; the cocaine had to be suppressed as the tainted fruit of the illegal seizure. (*Ibid.*)

*U.S.* v. *Ibarra, supra,* 955 F.2d at page 1411, must be distinguished from the present case. Although the *Ibarra* court does not state any authority or offer an extended rationale for its holding, we note two significant, distinguishing aspects of the case. First, the officers had completed their search of the trunk, they found nothing, and defendant had closed and locked the trunk, all before the car was towed to the impound lot. Second, the discovery of the cocaine was, as a factual matter, a direct result of the illegal seizure of defendant's car.

In the present case, there was no initial, fruitless search. The search to which Nieblas consented had not yet occurred, and there is no reason to believe it *would not* have occurred if appellant, Nieblas and Para had not been detained. The purported detention of appellant and his companions (whether lawful or unlawful) did not, as a factual matter, lead to the search that recovered the currency. The absence of any factual nexus between the search and the purported detention leads us to conclude that the detention, even if unlawful, did not terminate the consent to search as did seizure of the car in *Ibarra.*

■ Further, the absence of this nexus leads us to reject appellant's proposed analogy to illegal detentions that *precede* the challenged consent to search. It is precisely the causal connection between the illegal detention and the ensuing consent that results in suppression of evidence discovered in a search pursuant to a tainted consent: "[I]t is axiomatic that a consent to search *produced by* an illegal arrest or detention is not voluntary." (*People* v. *Valenzuela* (1994) 28 Cal.App.4th 817, 833 [33 Cal.Rptr.2d 802], italics added.) Where subsequent events adequately dispel the coercive taint of the initial illegality—i.e., where there is no longer causality—the subsequent consent is given full effect. (See *U.S.* v. *Ibarra, supra,* 955 F.2d at p. 1411, fn. 8; cf. *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 251 [118 Cal.Rptr. 166, 529 P.2d 590].)

■ Even if we were to find the detention here illegal, it did not produce or lead to the search. We conclude the unlawful detention of appellant and

his companions, if any, did not terminate Nieblas's consent for the search of the pickup truck. We now turn to the issue of the scope of that consent.

■ In *Florida* v. *Jimeno* (1991) 500 U.S. 248, 251 [111 S.Ct. 1801, 1803-1804, 114 L.Ed.2d 297], the Supreme Court established that the scope of a consent to search is measured by a standard of objective reasonableness: "[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?" "A consensual search may not legally exceed the scope of the consent supporting it. (*Walter* v. *United States* (1980) 447 U.S. 649, 656-657 . . . .) Whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of circumstances. . . . Unless clearly erroneous, we uphold the trial court's determination." (*People* v. *Crenshaw* (1992) 9 Cal.App.4th 1403, 1408 [12 Cal.Rptr.2d 172].)

■ In this case, Stevenson told Nieblas he wanted to search for narcotics. The pickup was filled with large bags of pasture seed, as well as numerous suitcases. As the Supreme Court stated in *Jimeno*: "We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs." (*Florida* v. *Jimeno*, *supra*, 500 U.S. at p. 251 [111 S.Ct. at p. 1804].)[5] Before moving the men to the patrol car, Stevenson told Nieblas, in reference to the seed bags, "this might take a while." Despite Stevenson's observation, Nieblas did not withdraw his consent or limit it in any way. (See *People* v. *Bell* (1996) 43 Cal.App.4th 754, 771-772 [51 Cal.Rptr.2d 115].) A "typical reasonable person" in Nieblas's circumstances would have expected that Stevenson intended, in some manner, to inspect the contents of the seed bags and the suitcases. Thus, the seizure would be extended and the search would be extensive, in the contemplation of a reasonable person.

The remaining questions are whether transportation of the pickup to an off-highway location and use of a drug dog exceeded the scope of the consent. We are satisfied that neither the fact that the pickup was moved before it was searched nor that a dog was used to sniff the contents of the truck expanded the search beyond the general search for drugs that a reasonable person would have anticipated.

---

[5]This particular restatement of the test of objective reasonableness in *Jimeno*, that "the police conclude" the search was authorized, is different from Chief Justice Rehnquist's original statement of the test, "what would the typical reasonable person have understood . . . ." (500 U.S. at p. 251 [111 S.Ct. at p. 1803].) Although quoting the looser version of the test in the text above, we in fact apply the Chief Justice's original formulation: A person who consents to a drug search of a pickup truck full of bags would reasonably understand that the officer intended to search the bags. (See *ibid.*)

In other words, the search was neither more nor less intrusive because it was conducted in a quieter location—appellant does not contend Nieblas's consent was premised on the idea that Stevenson would be too distracted in the middle of Highway 99 to conduct an effective search. (Cf. *People* v. *Cooney* (1991) 235 Cal.App.3d Supp. 1, 5 [286 Cal.Rptr. 765] [defendant consented to search of house knowing gun was in locked closet to which she had the only key; consent did not include closet].) Nor was this a situation in which a consent to examine a bag of suspected drugs in the field resulted in transportation of the drugs to a sophisticated police laboratory for chemical testing. Absent some unusual factor involving the duration or intensity of the search, we fail to see how merely transporting the object to be searched expands in any way the search for which there was consent.

Similarly, use of the trained dog to sniff the truck, although not reasonably contemplated "by the exchange between the officer and the suspect" (*Florida* v. *Jimeno*, *supra*, 500 U.S. at p. 251 [111 S.Ct. at pp. 1803-1804]),[6] did not expand the search to which Nieblas had consented. "A 'sniff' by a trained drug-sniffing dog in a public place is not a 'search' within the meaning of the Fourth Amendment" at all. Accordingly, no consent is needed for participation of the dog. (*People* v. *Bell*, *supra*, 43 Cal.App.4th at p. 768.) While consent may be necessary for a seizure of the property while the dog sniffs it (*ibid.*), Nieblas clearly consented to a seizure of the pickup and its contents for the time reasonably necessary to search all of the seed bags and luggage. Accordingly, we conclude the authorized scope of the search was not exceeded by use of the drug dog.

The permissible scope of the search in this case extended to any part of the pickup where drugs reasonably may have been hidden. "The scope of a search is generally defined by its expressed object." (*Florida* v. *Jimeno*, *supra*, 500 U.S. at p. 251 [111 S.Ct. at p. 1804].) Once the dog alerted to the rear panels of the truck and the officers were able to see through the existing space between the bed liner and the side panels that there were foreign objects concealed there, search of the area behind the bed liner was within the scope of the original consent, which impliedly extended to any area where drugs could be hidden. (See *People* v. *Crenshaw*, *supra*, 9 Cal.App.4th at p. 1415.) We therefore reject appellant's contention that the search behind the bed liner was unauthorized by the original consent.

Appellant further objects to the removal of the pickup to the sheriff's station, detaining the truck overnight, and conducting another search the following morning. The currency and all other evidence of any significance

---

[6]Stevenson, for example, stated in the incident report that he did not decide to call for a drug dog until after he had studied the situation further.

was found during the initial search at the truckstop, however. Thus, even if we concluded these additional measures exceeded the initial consent, that conclusion would not result in suppression of the evidence the deputies had already seized before they took the additional measures.

 We now turn to appellant's second general contention, that respondent did not establish probable cause to believe the currency was subject to forfeiture at the hearing on the motion for return of property. *People* v. *Superior Court (Moraza)*, *supra*, 210 Cal.App.3d 592 is the only published California case discussing the nature of the probable cause that must be shown, and that case, by its own terms, dealt with the government's burden of proof at the trial of a forfeiture petition. (See *id.* at p. 598; see also *U.S.* v. *U.S. Currency, $30,060.00* (9th Cir. 1994) 39 F.3d 1039, 1041.) Probable cause, according to *Moraza*, "is often defined as a reasonable ground for belief of guilt, less than prima facie proof but more than mere suspicion." (210 Cal.App.3d at pp. 598, 601-602; see 39 F.3d at p. 1041.)[7]

 As articulated in *Moraza* and in the federal cases, the concept of probable cause in the forfeiture context seems no different to us than the "probable cause" defined in *Illinois* v. *Gates* (1983) 462 U.S. 213, 230-232 [103 S.Ct. 2317, 2328-2329, 76 L.Ed.2d 527]. (See *U.S.* v. *$191,910.00 in U.S. Currency* (9th Cir. 1994) 16 F.3d 1051, 1071 ["The standard of probable cause to support a forfeiture is similar to that required for a search warrant."].) According to *Gates*, probable cause is a " 'practical, nontechnical conception.' . . . 'In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' . . . [¶] [P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts . . . ." (*Illinois* v. *Gates*, *supra*, at pp. 231-232 [103 S.Ct. at pp. 2328-2329].) Thus, the *Gates* standard helps us determine whether a particular showing is more than a mere suspicion, though less than prima facie proof of forfeitability.

 Did the facts presented to and impliedly credited by the trial court constitute probable cause to believe the currency was subject to forfeiture

---

[7]In passing, the *Moraza* court stated the following: "The use of the phrase 'probable cause' may cause some confusion in this respect since it is also the phrase of art to test the constitutional validity of arrests and searches. But under the forfeiture laws, again, the probable cause test is not the yardstick of the initial seizure but is simply the government's prima facie case of nexus justifying forfeiture, which the claimant may rebut." (210 Cal.App.3d at p. 602.)

under section 11470, subdivision (f)?[8] Appellant asserts, and respondent does not dispute, that we review probable cause de novo. This would appear to be the correct standard of review, given the constitutional due process implications of a temporary seizure of property without a warrant or other preliminary judicial determination of probable cause. (See *United States* v. *James Daniel Good Real Property* (1993) 510 U.S. 43, 52 [114 S.Ct. 492, 500, 126 L.Ed.2d 490].) We proceed, therefore, in accordance with the parties' assumption.

 In this case we have an unusually large amount of cash[9] hidden in the back of a pickup truck. While the owner of the cash told the deputies and stated in his declaration that he brought the money *into* the United States from Mexico, his traveling companion told the tow-truck driver the men wanted to return *to* Mexico (inferentially, with the cash) the same night the cash was seized.[10] There is no plausible explanation tendered by appellant for the way he supposedly accumulated, in his home state of Sinaloa,

---

[8]Section 11470, subdivision (f), provides for forfeiture of: "All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, or securities used or intended to be used to facilitate any violation of Section 11351, 11351.5, 11352, 11355, 11359, 11360, 11378, 11378.5, 11379, 11379.5, 11379.6, or 11382 of this code, or Section 182 of the Penal Code, insofar as the offense involves manufacture, sale, possession for sale, offer for sale, or offer to manufacture, or conspiracy to commit at least one of those offenses, if the exchange, violation, or other conduct which is the basis for the forfeiture occurred within five years of the seizure of the property, or the filing of a petition under this chapter, or the issuance of an order of forfeiture of the property, whichever comes first."

[9]The significance derived from the amount of cash is demonstrated, for example, by section 11488.4, subdivision (i), wherein the Legislature describes the government's burden of proof during a contested forfeiture trial. For amounts under $25,000, the government must prove the nexus to narcotics beyond a reasonable doubt; for cash in the amount of $25,000 or more, the government must prove the nexus only by clear and convincing evidence, presumably because such a large amount of cash is inherently more likely to be used for or to be the unlaundered result of drug transactions.

[10]Appellant argues briefly that his statements and those of his companions must be suppressed in this forfeiture proceeding because they were the result of a custodial interrogation and *Miranda* admonitions were not administered. Violation of the prophylactic rule of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] is not a violation of the Fifth Amendment; evidence resulting from a *Miranda* violation should be suppressed only with great caution. (See *Oregon* v. *Elstad* (1985) 470 U.S. 298, 309 [105 S.Ct. 1285, 1293, 84 L.Ed.2d 222].) In the absence of a very persuasive reason to do so, which appellant has not provided, we can see no reason to expand *Miranda* into the area of civil forfeitures, where the defendant's right to counsel (*People* v. *$30,000 United States Currency* (1995) 35 Cal.App.4th 936, 943-944 [41 Cal.Rptr.2d 748]) and possibly other constitutional rights (see *United States* v. *Ursery* (1996) 518 U.S. 267, __ [116 S.Ct. 2135, 2147, 135 L.Ed.2d 549] [double jeopardy]) differ markedly from those applicable in a criminal prosecution. As a result, we need not consider whether appellant was "in custody" for *Miranda* purposes despite the repeated admonitions of the deputies that he was not being detained and was not under arrest.

hundreds of miles from the United States-Mexico border,[11] nearly $80,000 in American currency, most of it in small bills. Nor, if we credit the statement to the tow truck driver, does appellant give any explanation whatsoever how he came to be transporting this amount of American currency to Mexico.

In addition to the amount of currency itself, appellant's driver, Nieblas, was then on probation for possession of heroin for sale. The currency was bundled with duct tape, in a manner known to be used by drug traffickers (and not, for example, by banks). Finally, and most tellingly, the trained drug dog alerted on five different locations about the pickup truck, including locations other than where the currency was found. [12,13]

Appellant's objections to the overall force of this evidence are wholly unpersuasive. He says virtually all United States currency is contaminated by traces of cocaine. While this may be true, there is no comparable evidence that virtually all 1995 Dodge Ram pickups are similarly contaminated, and this is the more inculpatory aspect of the dog-sniff evidence in this case. Appellant says Nieblas's heroin conviction cannot be held against him for an "infinite duration." In truth, the conviction was not remote, as Nieblas still was on probation for the offense.

The evidence presented at the hearing on the motion to return property was sufficient to establish probable cause to believe the currency was subject to forfeiture under section 11470.

The judgment is affirmed.

Dibiaso, Acting P. J., and Harris, J., concurred.

---

[11]The New International Atlas (Rand McNally Co. 1989) at page 232.

[12]The uncontradicted evidence was that during controlled training exercises Enzo had never falsely alerted to a location uncontaminated by drugs.

[13]See also *People* v. *$497,590 United States Currency* (1997) 58 Cal.App.4th 145 [68 Cal.Rptr.2d 185], not final at the time the present opinion was filed.