Filed 7/14/15  P. v. Pollack CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JACK DAVID POLLACK,<br><br>        Defendant and Appellant. | A141132<br><br>(Lake County<br>Super. Ct. No. CR931079) |

Defendant appeals a judgment convicting him of possession of methamphetamine for sale, transportation of methamphetamine, and unlawful possession of a firearm by a felon, and sentencing him to 18 years in state prison. He contends the trial court erred in denying (1) his request for a trial continuance to accommodate newly retained counsel and (2) his motion to suppress. He also contends the court made numerous evidentiary errors that prejudicially led the jury to believe that he was engaged in other unrelated marijuana cultivation or, at the very least, was closely associated with others who were. Finally, he contends he should have been sentenced to county jail rather than state prison under the Criminal Justice Realignment Act of 2011. We find no prejudicial error and shall affirm the judgment.

**Factual and Procedural History**

Defendant was charged with possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 1), transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a); count 2), and unlawful possession of a firearm (Pen. Code, § 29800, subd. (a); count 3). As to the methamphetamine charges, the amended information

1

alleged that defendant had suffered six prior controlled substance convictions (Health & Saf. Code, § 11370.2, subd. (c)) and two prior prison terms (Pen. Code, § 667.5, subd. (b)).

The following evidence was presented at trial:

On November 9, 2012, about noon, Lake County Detective Dennis Keithly was driving on Highway 29 between Middletown and Lower Lake. Detective Joe Dutra was ahead of Detective Keithly in a separate car. A gray Ford pickup truck and a white Chevy pickup truck were blocking the roadway. The driver of the Chevy, defendant, and the driver of the Ford, Piyaco Brown, were attempting to push the Ford into a pullout on the side of the road.

Detective Keithly recognized defendant and asked him if he could search his truck. Defendant said yes. In the passenger compartment, the officers found a pump switch wedged between the seatbelt latch and the center console within which was a pouch containing three bags of methamphetamine. The officers also found $1,490 in cash in defendant's wallet. Keithly did not discover any drug use paraphernalia in defendant's truck.

When Keithly told defendant that he found methamphetamine in his truck, defendant admitted it was his but denied that he was selling methamphetamine.

A search warrant was executed at defendant's house later that day. In a workbench area in the garage, officers found a digital scale with white residue, more leather pouches identical to the one found in defendant's truck, and an operating scanner set to the sheriff's office's primary channel. In a bedroom, next to a desk that appeared to have been used by defendant, officers found a "clearly visible" rifle propped in a corner. The officers did not find in the house any needles, straws, pipes, or other paraphernalia for methamphetamine use.

Detective Keithly opined, based on his training and experience, that the methamphetamine found in defendant's truck was packaged for sale. Keithly also testified that defendant was not displaying any symptoms of being under the influence of methamphetamine at the time of his arrest. He explained that heavy users will display

2

physical signs of their habit, including track marks, "sucked up" faces, and body sores, will have trouble sitting still, and will sweat profusely when using.

The parties stipulated that at the time of the charged offenses defendant was a convicted felon prohibited from possessing firearms.

Daniel Stein testified for the defense. He testified that he hired defendant to replace a well pump and on the morning of defendant's arrest had given defendant a $1,700 advance, in cash, for performing the work.

Ryan Runyon, founder of a residential drug and alcohol treatment program, testified that despite his experience with drugs and treatment, he was not certain he could tell "the difference between a user and a seller." Runyon opined that it was not unusual for methamphetamine users to possess eight to nine grams of methamphetamine and he had also known users to have scanners and to use scales. Runyon had known defendant since 2011. In the month preceding trial, defendant was receiving outpatient services from Runyon, consisting of individual and group therapy.

Kim Cochran testified that in the morning of November 9, he dropped off a rifle at defendant's house with defendant's wife, Peggy Pollack. Cochran did not see defendant at the home and never told defendant he was storing a rifle at his house.

Peggy testified that she had been married to defendant for nearly 19 years. Defendant had been a drug addict for 15 years, "on and off." He usually used methamphetamine. Around the time of his arrest, he used methamphetamine daily. His teeth had deteriorated, and he used false teeth. She testified that she agreed to hold Cochran's gun that morning, that defendant was not home when it was dropped off, and that she did not tell defendant about the gun. She testified that defendant owned the scanner "[f]or emergency reasons."

On rebuttal, Detective Dutra testified that he spoke to Peggy when the house was searched and the rifle located. Peggy told him they had found the rifle when cleaning a rental property. Another officer involved in the search of defendant's residence confirmed that he heard Peggy tell Detective Dutra that defendant cleans rental properties, that the rifle was left behind by the previous tenants, and that defendant brought it home after

3

cleaning the site. Peggy acknowledged having that conversation with Dutra, but claimed that she was referring to a pellet gun that was found in the garage, not the rifle. She did not realize that Dutra was talking about the rifle until Cochran returned that evening and the rifle was not there.

The jury found defendant guilty as charged. Thereafter, the trial court found true all the special allegations.

Defendant was sentenced to 18 years in prison, calculated as follows: the upper term of four years for transporting methamphetamine, three years each for four prior controlled substance convictions, and one year for each of the prior prison terms. The trial court stayed the upper term of three years for possessing methamphetamine for sale pursuant to Penal Code section 654, imposed a concurrent upper term of three years for the unlawful possession of a firearm, and dismissed two of the prior controlled substance convictions pursuant to Penal Code section 1385.

Defendant timely filed a notice of appeal.

**Discussion**

1. *The court did not abuse its discretion in denying defendant's request for a continuance to accommodate newly retained counsel.*

Defendant contends he was denied his constitutional right to counsel of his choice when the trial court refused to grant a continuance so that retained counsel could prepare for trial, thereby effectively denying his request to substitute in retained counsel.

A. Background

The complaint was filed in this case in December 2012. The preliminary hearing was conducted in May 2013 and defendant was arraigned on the information on June 4, 2013. At the arraignment, the case was set for trial on July 17. Defendant was represented at the preliminary hearing and arraignment by appointed counsel.

At a settlement conference on July 1, 2013, appointed counsel stated that defendant was in the process of retaining private counsel and that he needed a week for that attorney to appear. The court continued the case to July 8 for settlement conference and appearance of new counsel.

4

On July 8, appointed counsel requested the settlement conference be further continued because defendant was still the process of retaining private counsel. The court denied the request, noting that the court would hear defendant's motion to suppress the next day as scheduled. At the suppression hearing on July 9, appointed counsel stated that two necessary defense witnesses had not appeared. The court ordered body attachments for the missing witnesses and continued the matter to July 12, for a hearing on the status of the witnesses.

On July 11, defendant moved to continue the trial on the ground that he was still seeking to retain private counsel. At the hearing the following day, appointed counsel reiterated that defendant was "diligently attempting to hire private counsel." Appointed counsel stated he had spoken with an attorney who said he was "likely going to be hired . . . once [defendant is] able to acquire the funds for their services, which they anticipate to occur in the not too distant future." Defendant confirmed that he had been in a residential treatment program until "[a] week" ago and that he was raising money to pay for his new attorney, stating he would have the money by "[t]his coming up week . . . one hundred percent for sure." Over the prosecutor's objection, the court continued the trial until September 5, but told defendant, "If you come in with a lawyer towards September, that's just going to be too bad; it's going to trial." Defendant responded, "I understand." Later, the hearing of defendant's motion to suppress was also continued to September 5.

On September 5, appointed counsel requested another continuance because the witnesses had not appeared. The prosecution opposed a continuance, noting "[t]his is the third time that we've shown up with our witnesses ready to go." The court continued the case, setting the next hearing for September 20. The suppression motion was ultimately heard and denied on September 24. At the status hearing on September 27, the court confirmed that the case was set for trial on October 2.

On October 2, defendant appeared with his appointed counsel and newly retained counsel, Roy Miller. Miller indicated he had been contacted by defendant earlier, but that

defendant had not been able to afford Miller's representation until "yesterday."[1] Miller indicated he was not prepared to go forward with trial, as there were problems with the subpoenas for the defense witnesses and he had not reviewed the police reports or transcripts. Miller said that if he could resolve the issues with the defense witnesses, he could be ready for trial by November 4.

The court denied defendant's motion for a continuance, finding that it was "an unreasonable request under these circumstances." The court expressed concern that a jury panel had already been summoned, and explained that when the matter was confirmed for trial the previous Friday, there was no mention of new counsel at that time.

B. <u>Analysis</u>

"The right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing. [Citations.]' [Citation.] Underlying this right is the premise that 'chosen representation is the preferred representation. Defendant's confidence in his lawyer is vital to his defense. His right to decide for himself who best can conduct the case must be respected wherever feasible.' " (*People v. Courts* (1985) 37 Cal.3d 784, 789 (*Courts*).) The unjustified deprivation of counsel of the defendant's choice is a structural error requiring reversal, and is not subject to harmless error analysis. (*United States v. Gonzalez–Lopez* (2006) 548 U.S. 140, 149-150.)

"Generally the trial court has discretion whether to grant a continuance to permit a defendant to be represented by retained counsel." (*People v. Jeffers* (1987) 188 Cal.App.3d 840, 850.) "A continuance may be denied if the accused is 'unjustifiably dilatory' in obtaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial.' " (*Courts*, *supra*, 37 Cal.3d at pp. 790-791.) Trial courts should accommodate requests for continuances to obtain retained counsel " 'to the fullest extent consistent with effective judicial administration.' " (*Id*. at p. 791.) In determining whether denial of a continuance is so arbitrary as to violate due process, courts look to the

---

[1] Miller is not the attorney defendant thought he would likely retain at the time he sought the continuance in July.

6

circumstances of each particular case, particularly the reasons presented to the trial court. (*Ibid.*)

In *Courts*, the California Supreme Court held the trial court's failure to grant a requested continuance constituted error where the defendant made diligent efforts "(1) to secure counsel of his own choosing before the date of trial, and (2) to apprise the court of his wishes at the earliest possible time." (*Courts*, *supra*, 37 Cal.3d at pp. 795-796.) Significant in *Courts* were the following facts: After two months of effort, the defendant had completed his financial arrangements and retained private counsel five days before trial was to start; the defendant unsuccessfully moved for a continuance eight days before trial; and the defendant attempted to calendar a renewed motion four days before trial, but the renewed motion was not actually heard until the trial date, when the motion was again denied. (*Id*. at pp. 787-789.) The Supreme Court emphasized, "a lawyer-client relationship had been established" five days before trial if not earlier; thus, "the court was not confronted with the 'uncertainties and contingencies' of an accused who simply wanted a continuance to obtain private counsel." (*Id*. at p. 791.) *Courts* also emphasized the absence of "circumstances which warranted the limitation of appellant's right to counsel based on considerations of judicial efficiency." (*Courts*, *supra*, 37 Cal.3d at p. 794.) The court explained, "The record fails to show that a continuance would have significantly inconvenienced the court or the parties. [Citation.] There was no evidence that the Shasta County Superior Courts were particularly congested during this period. If anything, the availability of two judges to try the case . . . suggests the contrary. No mention of inconvenience to jurors . . . was ever made. . . . [¶] In addition, the prosecutor failed to express any valid concern about an inconvenience to witnesses which might have resulted if a continuance had been granted." (*Id*. at pp. 794-795, fn. omitted.)

In contrast, in this case defendant was warned in July that time was running out to retain counsel and that the court would not continue the trial if he appeared with new counsel on the eve of trial. That is precisely what defendant did. As the court noted, the case was confirmed for trial on the Friday before and defendant did not indicate that he had retained counsel or was still attempting to retain counsel. Defendant was granted

7

numerous continuances because his witnesses had not appeared, inconveniencing the court and the prosecution's witnesses who had appeared for the continued hearings. Defendant argues that all of the prosecution's witnesses lived locally or were employees of the county and could have been resubpoenaed. Had this been defendant's first request for a continuance, this factor might have been entitled to greater weight. Since the witnesses had been subpoenaed three times, however, it was reasonable to conclude they were being unfairly burdened by the continuances. On October 2, the prosecution's witnesses were present and the prospective jurors had been called to the courtroom. Under these circumstances, we cannot say that the court abused its discretion in denying the motion to continue.

2.      *Defendant's motion to suppress was properly denied.*

Defendant contends the trial court erred by denying his motion to suppress because the search of his truck exceeded the scope of his consent.

A.      Background

Defendant filed a motion to suppress alleging that the search of his truck was unlawful and that the evidence located in the truck and in his residence should be suppressed. The following testimony was presented at the hearing on the motion:

The parties stipulated there was no warrant for the search of defendant's truck. Detective Keithly testified that he recognized defendant as a narcotics offender and asked him if he had anything illegal on his person or in his vehicle. Defendant said no. Keithly pat-searched defendant and found nothing. Keithly asked if he could search defendant's vehicle and defendant responded, "Yes." Dutra heard Keithly ask for consent to search defendant's person and vehicle and heard defendant respond "yes." Defendant testified that when Keithly asked if he could search him and his truck, defendant responded, "You can search me but not my truck." Brown testified that he heard the detectives ask if they could search defendant's person and truck and heard defendant say that they could search his person but not his truck.

The detectives found methamphetamine concealed inside a pump switch in the driver's seat. An electric pump switch is a round tube with wires used as a switch for a

8

pump. The switch in defendant's truck had a non-screw-top lid. Keithly did not ask defendant for permission to open the pump switch and opened the lid without using force or tools.

The prosecutor argued that the evidence showed that defendant had consented to the search. The defense countered that no consent had been given, and that even had defendant consented to a search of his truck, the detectives exceeded the scope of that consent by opening a container within the truck.

The court denied the motion, finding that "the People have met their burden to show that this was a consent search."

B.     Analysis

The standard of review for the denial of a motion to suppress is well settled. "We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

A warrantless search is presumed illegal. (*People v. James* (1977) 19 Cal.3d 99, 106.) "Consent to a search is a recognized exception to the Fourth Amendment's warrant requirement. [Citation.] The prosecution bears the burden to prove that a warrantless search was within the scope of the consent given. [Citation.] 'A consensual search may not legally exceed the scope of the consent supporting it. [Citation.]' [Citation.] 'The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect? [Citations.]' [Citation.] 'Whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of circumstances. [Citation.] Unless clearly erroneous, we uphold the trial court's determination.' " (*People v. Cantor* (2007) 149 Cal.App.4th 961, 965.)

In *Florida v. Jimeno* (1991) 500 U.S. 248, 251, the high court explained that the scope of consent usually is defined by the expressed object of the search. In that case,

9

where a police officer stopped a vehicle, informing the occupant of the officer's suspicion that the vehicle contained narcotics, the driver's consent to a search of the vehicle reasonably could be understood to include within its scope the search of a closed paper bag discovered within the vehicle. The court reasoned that despite being informed that the officer would be looking for narcotics, the defendant "did not place any explicit limitation on the scope of the search." (*Ibid*.) The court concluded, "We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container. . . . The authorization to search in this case, therefore, extended beyond the surfaces of the car's interior to the paper bag lying on the car's floor." (*Ibid*.) Although the court warned that the defendant's consent probably would not extend to a locked briefcase in the trunk of the car, the court rejected the defendant's contention that the police must request separate permission to search each container in the area to be searched. (*Id*. at pp. 251-252.)

Here, the record establishes that the officer recognized defendant as a narcotics offender and defendant also recognized the officer. Although the evidence was conflicting, the court was entitled to believe the prosecution witnesses who testified that defendant consented to the search without any qualification. A reasonable person in these circumstances would understand the officer's request for consent to search as a request to search for drugs and would have believed that the container in which the officer found the drugs was within the scope of the consent given. (*People v. Crenshaw* (1992) 9 Cal.App.4th 1403, 1415 [consent to search the car for drugs included consent to remove the door vent and search the door panel which might reasonably hold drugs.]; *People v. Williams* (1980) 114 Cal.App.3d 67, 73 [consent to search a vehicle "authorize[s] a search of all compartments in the automobile and of any containers found within those compartments"]; *People v. $48,715 United States Currency* (1997) 58 Cal.App.4th 1507, 1516 ["The permissible scope of the search in this case extended to any part of the pickup where drugs reasonably may have been hidden."].) The pump switch was not within a

10

locked compartment and no tools were required to open it. It was located in plain sight, next to the driver's seat.

Defendant's reliance on *People v. Cantor, supra,* 149 Cal.App.4th 961 is misplaced. In that case, the officer asked the defendant whether he had anything illegal in his car and asked if he could " 'check real quick and get [the defendant] on [his] way,' " and the defendant agreed. (*Id*. at p. 964.) The officer searched the cab, the trunk, under the hood, and the cab several more times. (*Ibid*.) He called for a police dog and removed items from the trunk. (*Ibid*.) He found a record cleaner inside the trunk, removed the screws holding the back panel to the cleaner, pulled a paper bag out, and found cocaine inside of the bag. (*Ibid*.) The court held that the officer's search of the defendant's vehicle exceeded the scope of the defendant's consent. (*Ibid*.) The court explained, "The trial court erred as a matter of law by failing to recognize the limited scope of [the] defendant's consent. Once [the officer's] exhaustive search of all compartments of the car revealed no contraband, [the] defendant's consent ended." (*Id*. at pp. 965-966.) Critical to the court's determination was the fact that the defendant agreed to only "a 'real quick' 'check' of the car." (*Id*. at p. 965.) Here, no similar limitation was placed on the search of defendant's truck and the drugs were located within a brief period after defendant gave his consent to the search.

We find no error in the denial of defendant's motion to suppress. [2]

3.    *Defendant's witnesses were not improperly impeached.*

Defendant contends that the court erred in allowing three of his witnesses to be impeached with evidence that they "were criminals and drug dealers." He argues the evidence was highly prejudicial and deprived him of a fair trial. A trial court's ruling on

---

[2] At the trial, Detective Keithly testified that he opened the lid of the container by wiggling, prying and unscrewing it. On appeal, defendant argues, that if these additional facts are deemed dispositive, then he was denied his state and federal constitutional rights to effective assistance of counsel based on his attorney's failure to bring out these facts at the motion to suppress hearing. (*Strickland v. Washington* (1984) 466 U.S. 668.) These additional facts, however, would not alter our conclusion that the court properly denied the motion to suppress.

the admissibility of evidence, including a ruling on an Evidence Code section 352 objection, is reviewed for abuse of discretion. (*People v. Cox* (2003) 30 Cal.4th 916, 955, overruled on other grounds *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

    A.    <u>Daniel Stein</u>

Defendant contends Stein was improperly impeached with evidence that he had a prior conviction for cultivation of marijuana. During cross-examination, the prosecutor asked Stein if he pled guilty to or was convicted of cultivation of marijuana in Los Angeles in March 2011. Defense counsel objected on relevance grounds, and the court overruled the objection. Stein responded that "it was a DEJ [delayed entry of judgment]." When the prosecutor attempted to press Stein on whether he had pled guilty, the court interrupted the cross-examination and addressed counsel off the record. At the conclusion of Stein's testimony, defense counsel asked that Stein's "answers regarding the DEJ be stricken" and the court said "okay."

Later, outside the presence of the jury, there was a discussion between the court and counsel about whether a person placed on deferred entry of judgment can be impeached with the underlying charge. Ultimately, the court concluded that the prosecution "can't use [a] deferred entry of judgment plea of guilty for purposes of impeachment pursuant to section . . . 788 of the Evidence Code." The court told counsel that it would instruct the jury "to disregard any testimony about the witness Daniel Stein's involvement with a violation of Health and Safety Code section 11358." Thereafter, the court advised the jury that "[a]ny questions and answers relating to marijuana during the testimony of Daniel Stein are ordered stricken." The jury was given the standard closing instructions that it should disregard stricken testimony and not consider it for any purpose.

Defendant argues that "the court's brief admonition to the jury that '[a]ny questions and answers relating to marijuana during the testimony of Daniel Stein are ordered stricken,' without any further explanation or even an admonition to disregard the testimony, was insufficient to negate the prejudice arising from having the jury learn of Stein's alleged marijuana cultivation." However, the court did admonish the jury to

12

disregard the stricken testimony as part of the standard closing instructions and we must assume that the jury did so. (*People v. Beach* (1983) 147 Cal.App.3d 612, 624 ["It must be presumed that the jurors followed the instructions of the trial court."].)

Moreover, the potential prejudice of this evidence was substantially reduced by the fact that the prior conviction was for cultivation of marijuana and not for the sale of the drug. Defendant did not deny that he was a drug user. The relevant question for the jury was whether he was selling methamphetamine.

B.      Kim Cochran

Defendant contends the court erred in allowing the prosecutor to question Cochran about whether he saw marijuana plants growing at defendant's house. At an Evidence Code section 402 hearing held prior to Cochran's testimony, the court held that the prosecutor could ask the question of Cochran. Although the court initially expressed concern "about Mr. Pollack getting associated with marijuana, that really has nothing to do with the charges in this case," the court ultimately allowed the question because the prosecutor had represented to the court that the marijuana plants would have been visible to someone at the front door and the prosecutor was "testing the credibility of this witness on a point that is absolutely germane to the issues in this case; that is, whether or not he was there."

At trial, when the prosecutor asked Cochran whether he saw the marijuana plants at defendant's home, Cochran testified that he had seen the plants. The prosecutor then attempted to impeach Cochran with testimony, given the day before at the Evidence Code section 402 hearing, in which he denied seeing the marijuana plants at the house. In response to the prosecutor's questions, Cochran explained that he thought he said that he did not "think" he saw any marijuana plants, but that he now thought that there could have been marijuana on the other side of some bamboo by the front door.

There was no error in the admission of this testimony. Defendant concedes that the question was relevant because it tested Cochran's credibility, but argues that the evidence should have been excluded because his credibility could have been tested in other less prejudicial ways However, defendant does not suggest what other means the prosecutor

13

could or should have used to test Cochran's credibility, and the prosecutor was not required to ask a different question if the answer elicited by the question was not unduly prejudicial. Since defendant was an admitted methamphetamine user, the fact that he had marijuana plants growing in his home was not unduly prejudicial. Moreover, defendant's wife took responsibility for the plants, claiming they were a medicinal treatment for her cancer.

Defendant also contends the court erred by allowing Cochran to be impeached by evidence that he and Peggy "were engaged in a major marijuana cultivation and trafficking operation." Prior to Cochran's testimony, the court ruled that evidence of participation by Cochran and Peggy in a marijuana cultivation business was relevant because it establishes his "bias, interest, or other motive" for testifying on behalf of defendant. (Evid. Code, § 780, subd. (f).) The court also ruled that because Cochran would invoke his Fifth Amendment right if questioned directly about his business relationship with Peggy, the evidence could be presented through testimony by Keithly and Peggy.

Consistent with the court's ruling, Keithly testified that he had contact with Cochran a couple of months prior to trial when serving an unrelated search warrant. Cochran was present at the service of the search warrant when officers located 80 marijuana plants at a property in Lower Lake. At that time, officers found three pounds of processed marijuana in Cochran's truck. They also found notebooks containing a "to-do list pertaining to the cultivation, the watering and caring for the marijuana plants." Peggy's phone number was found in one of the notebooks. Peggy testified she had a "business-type" relationship with Cochran, but denied it involved the sales and distribution of marijuana.

Defendant contends this evidence was unduly prejudicial and should have been excluded. Defendant argues that the testimony "about his wife and Cochran being engaged in marijuana cultivation and trafficking, unfairly implicated appellant directly" and "given appellant's relationship to these witnesses, there was a danger that the jury believed appellant himself was involved in ongoing cultivation and trafficking of

14

marijuana." However, nothing in the contested evidence suggested Cochran and Peggy were involved in marijuana trafficking. Keithly did not testify that any indicia of sales was found in the notebooks seized from Keithly's truck. At most, the evidence established that Cochran and Peggy were involved in a fairly large cultivation operation. Because defendant was an admitted drug user, the fact that he was closely associated with people that grew marijuana would not be particularly prejudicial. (*People v. Karis* (1988) 46 Cal.3d 612, 633 [" 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' "].)

C.     Peggy Pollack

On cross-examination, Peggy acknowledged that she had received food stamps from 2010 through 2012 and that she had stated in her food stamps application, under penalty of perjury, that her household was drug free. She claimed, however, that she was not aware of any drug use by defendant at that time, so believed she was being truthful on the application. She also acknowledged that she had not reported defendant's income on the application because "he didn't qualify since he was a felon" and that she had been contacted by Social Services about the overpayment of benefits.

Defendant contends he was unfairly prejudiced by the suggestion that Peggy had committed welfare fraud. He argues, "Neither her assertion that the residence was drug free in 2011, nor her alleged failure to report appellant's income, have any bearing on whether appellant committed the charged offenses." This evidence, however, was clearly relevant to Peggy's credibility and not so prejudicial that the court was required to exclude it.

4.     *Defendant was not prejudiced by the admission of other crimes evidence.*

Defendant contends that the trial court erred in admitted evidence that tended to show that he was "engaged in criminal activity, or at the very least, was closely associated with others who were." In addition to the evidence of marijuana cultivation discussed above, defendant faults the court for allowing Keithly to testify that when he saw defendant on the side of the road, he recognized him from "prior law enforcement

15

contacts" and erred in allowing Runyon to testify that defendant first approached him for treatment in connection with an unrelated criminal case. Keithly's testimony however, was stricken by the court and the jury was advised not to consider it for any purpose. We presume the jury followed the court's instructions. More importantly, given the parties' stipulation that defendant was a convicted felon and prohibited from possessing firearms, there is no likely basis on which this testimony prejudiced defendant.

5.    *Defendant was properly sentenced to state prison.*

Defendant contends that under the Criminal Justice Realignment Act of 2011 (Realignment Act), Penal Code section 1170, subdivision (h), he should have been sentenced to the county jail, and not state prison.[3] "As relevant here, the Realignment Act significantly changes the punishment for some felony convictions. Under the terms of the Act, low-level felony offenders who have neither current nor prior convictions for serious or violent offenses, who are not required to register as sex offenders and who are not subject to an enhancement for multiple felonies involving fraud or embezzlement, no longer serve their sentences in state prison. Instead, such offenders serve their sentences either entirely in county jail or partly in county jail and partly under the mandatory

---

[3] Section 1170, subdivision (h) provides, in relevant part: "(1) Except as provided in paragraph (3), a felony punishable pursuant to this subdivision where the term is not specified in the underlying offense shall be punishable by a term of imprisonment in a county jail for 16 months, or two or three years. [¶] (2) Except as provided in paragraph (3), a felony punishable pursuant to this subdivision shall be punishable by imprisonment in a county jail for the term described in the underlying offense. [¶] (3) Notwithstanding paragraphs (1) and (2), where the defendant (A) has a prior or current felony conviction for a serious felony described in subdivision (c) of Section 1192.7 or a prior or current conviction for a violent felony described in subdivision (c) of Section 667.5, (B) has a prior felony conviction in another jurisdiction for an offense that has all the elements of a serious felony described in subdivision (c) of Section 1192.7 or a violent felony described in subdivision (c) of Section 667.5, (C) is required to register as a sex offender pursuant to Chapter 5.5 (commencing with Section 290) of Title 9 of Part 1, or (D) is convicted of a crime and as part of the sentence an enhancement pursuant to Section 186.11 is imposed, an executed sentence for a felony punishable pursuant to this subdivision shall be served in state prison."

16

supervision of the county probation officer." (*People v. Scott* (2014) 58 Cal.4th 1415, 1418.)

"[S]tate prison remains the default punishment for felony convictions even after realignment, unless the offense is punishable pursuant to subdivision (h) of section 1170." (*People v. Vega* (2014) 222 Cal.App.4th 1374, 1382.) In *Vega,* the court explained that section 18, subdivision (a) provides the general rule for sentencing felonies: " 'Except in cases where a different punishment is prescribed by any law of this state, every offense declared to be a felony is punishable by imprisonment for 16 months, or two or three years in the state prison unless the offense is punishable pursuant to subdivision (h) of Section 1170.' " (*Vega*, p. 1382.) Subdivision (h) of section 1170 "harmonizes its language with section 18 by starting both paragraphs (1) and (2) with the phrase 'Except as provided in paragraph (3), a felony punishable pursuant to this subdivision. . . .' " (*Vega*, p. 1382.) Under section 669, subdivision (d), "When a court imposes a concurrent term of imprisonment and imprisonment for one of the crimes is required to be served in the state prison, the term for all crimes shall be served in the state prison, even if the term for any other offense specifies imprisonment in a county jail pursuant to subdivision (h) of Section 1170." Accordingly, the first step in a court's analysis is to determine whether a given offense is subject to sentencing pursuant to section 1170, subdivision (h).

The parties do not dispute that defendant was subject to sentencing under section 1170, subdivision (h) for his two drug related offenses. (Health & Saf. Code, § 11378 ["a person who possesses for sale a controlled substance that meets any of the following criteria shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code"]; Health & Saf. Code, § 11379 ["[E]very person who transports, imports into this state, sells, furnishes, administers, or gives away, or offers to transport, import into this state, sell, furnish, administer, or give away, or attempts to import into this state or transport any [qualified] controlled substance . . . unless upon the prescription of a physician, dentist, podiatrist, or veterinarian, licensed to practice in this state, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code

17

for a period of two, three, or four years."].) The parties disagree, however, as to whether a conviction under section 29800 is subject to sentencing under Penal Code section 1170, subdivision (h).

Section 29800, subdivision (a)(1) provides: "Any person who has been convicted of a felony under the laws of the United States, the State of California, or any other state, government, or country, . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." The People argue that because section 29800 does not provide that the offense is punishable in accordance with section 1170, subdivision (h), it is subject to the default sentencing provisions of section 18. We agree that under the plain language of the statute, being a felon in possession of a firearm is a state prison offense under realignment.

Contrary to defendant's argument, section 28900 is not ambiguous. "[S]tatutory interpretation begins by examining the language of the statute, giving the words their ordinary meaning and considering them in the context of the statutory framework." (*People v. Kelly* (2013) 215 Cal.App.4th 297, 303.) "In interpreting a statute, a court's objective is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.] To do so, we look first at the statutory language. If it is clear and unambiguous, we go no further. If, however, the language is ambiguous, we apply appropriate tools of statutory construction." (*Id*. at pp. 304-305.) The fact that section 29800 does not expressly provide that the offense is punishable in state prison does not reflect a legislative intent that it is a low-level offense, the violation of which requires a local sentence, and not a prison sentence.

6. *The abstract of judgment should be amended to reflect 100 additional days of presentence custody credits.*

Defendant argues, and the People agree, that the abstract of judgment must be corrected to reflect a total of 308 days of presentence credit. The trial court awarded defendant 154 days of credit for time served and 154 days of conduct credits. The abstract of judgment correctly indicates those days, but erroneously totals them as 208 days. Accordingly, the trial court must amend the abstract of judgment to reflect a total of

18

308 days of presentence custody credit. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## Disposition

The judgment is affirmed. The abstract of judgment shall be corrected as indicated above.

_____

Pollak, J.

We concur:

_____

McGuiness, P. J.

_____

Jenkins, J.