Filed 7/13/22  P. v. Phouamkha CA1/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SAYKHAM PHOUAMKHA,<br><br>        Defendant and Appellant. | A164249<br><br>(Fresno County Super. Ct. No. F18905477)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

Defendant Saykham Phouamkha has filed a petition for rehearing, asserting that because our opinion concluded his North Carolina second degree murder conviction constituted a strike because it included all the elements of assault with a deadly weapon but not of second degree murder under California law, his sentence must be corrected.  It is ordered that the opinion filed herein on June 29, 2022, be modified as follows:

1

1. On page 20, second to last paragraph, delete the paragraph beginning "We therefore uphold defendant's second strike sentencing. . ." and replace with the following paragraph and subsequent paragraphs:

Although defendant's North Carolina second degree murder conviction constitutes a strike offense, albeit for a different crime, the effect of that prior strike offense of assault with a deadly weapon does not result in a sentence of 25-years-to-life.

When the current conviction is neither a serious nor a violent felony, a defendant is subject to a 25 years-to-life sentence only if certain exceptions under section 667 and 1170.12 apply. "[I]f a defendant has two or more prior serious or violent felony convictions as defined in subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7 that have been pled and proved, *and the current offense is not a serious or violent felony* as defined in subdivision (d), the defendant shall be sentenced pursuant to paragraph (1) of subdivision (e) *unless* the prosecution pleads and proves any of the following: [¶] (i) The current offense is a controlled substance charge. . . . [¶] (ii) The current offense is a felony sex offense. . . . [¶] (iii) During the commission of the current offense, the defendant used a firearm, was armed with a firearm or deadly weapon, or intended to cause great bodily injury to another person. . . . [¶] (iv) The defendant suffered a prior serious or violent felony conviction . . . for any of the following felonies: [¶] . . . [¶] (IV) Any homicide offense . . . defined in Sections 187 to 191.5, inclusive." (§§ 667, subd, (e)(2)(C)(i)-(iv)(IV); 1170.12, subd.(c)(2)(C)(iv)(IV), italics added.)

2

Although defendant has two prior serious or violent felony convictions in North Carolina, the second degree murder conviction did not constitute a homicide offense in California. And, his convictions for possession of a firearm by a felon and possession of ammunition by a felon are not serious or violent felonies under the Three Strikes law. (§§ 667.5, subd. (c), 1192.7, subd. (c).)

Accordingly, defendant "shall be sentenced pursuant to paragraph (1) of subdivision (e)" of section 667, which provides "the determinate term or minimum term for an indeterminate term shall be twice the term otherwise provided as punishment for the current felony conviction." (§§ 667, subds. (e)(1), (e)(2)(C); 1170.12, subds. (c)(1), (c)(2)(C).)

2. At page 25, the current Disposition is deleted and replaced by:

The matter is remanded to the trial court with directions to vacate the sentence and to impose sentence pursuant to Penal Code sections 667, subdivision (e)(1) and 1170.12, subdivision (c)(1), and to exercise its discretion as to whether the sentences for unlawful possession of a firearm and unlawful possession of ammunition shall run concurrently or consecutively. In all other respects, the judgment is affirmed.

Dated:

_____

Humes, P. J.

3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAYKHAM PHOUAMKHA,<br><br>    Defendant and Appellant. | A164249<br><br>(Fresno County<br>Super. Ct. No.<br>F18905477) |

After defendant Saykham Phouamkha consented to a search of his van, the police found ammunition, which he was prohibited from possessing due to a prior felony conviction.  He was arrested, and a search of his backpack, incident to his arrest, yielded a loaded firearm.  Defendant was charged and convicted by jury of unlawfully possessing a gun and ammunition.  The trial court then found two prior strike allegations true, and sentenced defendant to consecutive indeterminate 25-years-to-life sentences.

On appeal, defendant maintains (1) his consent to the search of the van was involuntary and therefore the gun and ammunition should have been suppressed, (2) a North Carolina second degree murder conviction did not qualify as a prior strike, and (3) the trial court erroneously believed it did not have discretion to impose concurrent, rather than consecutive, sentences.

1

We conclude remand is required for the trial court to exercise its discretion as to whether defendant's sentences shall run concurrently or consecutively, but in all other respects, we affirm.

## BACKGROUND

After Fresno police received a tip that defendant was carrying a weapon, Detective Ger Vang and Officer Scott Gray were dispatched to a local apartment complex. They approached defendant in the carport of the complex and asked for permission to search his vehicle, which he ultimately gave. Detective Vang found a box of .40 caliber ammunition on the rear passenger seat. The officers arrested defendant for possession of ammunition by a felon. The officers then searched defendant and found a gun in the backpack he was wearing.[1]

Defendant was charged with unlawful possession of a firearm and ammunition. (Pen. Code, §§ 29800, subd. (a)(1), 30305, subd. (a)(1).)[2] The district attorney also alleged defendant had two prior strike convictions, assault with a deadly weapon and second degree murder, both based on convictions in North Carolina.[3]

---

[1] We discuss the facts pertaining to the search in more detail in our discussion of that issue

[2] All further statutory references are to the Penal Code.

[3] In a consolidated case, the People charged defendant with two counts of assault with a deadly weapon, two counts of false imprisonment, intimidating a witness, and unlawfully possessing a firearm, all arising out of a 2018 family dispute in which defendant allegedly pointed a gun at his adult daughters and son-in-law. A jury found defendant not guilty of all but the false imprisonment count, on which it did not reach a verdict. That count was dismissed with a *Harvey* waiver, permitting the sentencing court in the instant case to consider the dismissed count when imposing sentence. (*People v. Harvey* (1979) 25 Cal.3d 754; *People v. Snow* (2012) 205 Cal.App.4th 932, 937.)

Defendant moved to suppress evidence of the ammunition and firearm, which the court denied. He then filed a motion to set aside the information on Fourth Amendment grounds, which the court also denied.

A jury found defendant guilty on both counts, and the court found true both prior "strike" allegations. The court sentenced defendant to an indeterminate term of 25 years-to-life for possession of the firearm and a consecutive term of 25 years-to-life for possession of the ammunition.

## DISCUSSION

### *The Motion to Suppress and Section 995 Motion*

Defendant challenges the denial of his motion to suppress and section 995 motion, asserting his "purported consent to search was involuntary."[4] (Underscoring omitted.) He claims his initial detention was unlawful, vitiating any subsequent consent and that officers also "flagrantly pressured [him] to permit a search."

At the hearing on the motion to suppress, Detective Vang testified he "received an e-mail from one of [his] Section 8 contacts," informing him a "subject . . . was seen with a handgun" at an apartment complex in Fresno.

---

[4] "A defendant may file a motion to suppress at the preliminary hearing based on the evidence introduced at that hearing. (Pen. Code, § 1538.5, subd. (f)(1).) If the magistrate denies the motion, the defendant may either renew the motion before the trial court or file a motion to dismiss under Penal Code section 995 raising the suppression issue. [Citations.] . . . [W]hen the defendant raises the suppression issue in a Penal Code section 995 motion, the trial court reviews the magistrate's determination for substantial evidence, and we review the magistrate's determination, not the court's." (*People v. Turner* (2017) 13 Cal.App.5th 397, 404.) " ' "We review the [magistrate's] resolution of the factual inquiry under the deferential substantial evidence standard. Whether the relevant law applies to the facts is a mixed question of law and fact that is subject to independent review." ' " (*Ibid.*)

Detective Vang looked up the individual's name in the police "records management system" and located defendant's name.

Detective Vang and Officer Gray went to the apartment complex and approached defendant, who was working on some speakers in the carport. A van was parked "diagonally across two of the carports." They "immediately patted [defendant] down for officer safety" based on the tip they had received that he had a firearm, but did not find one.

Police then asked for permission to search the van. Detective Vang did not get a warrant in advance because "[t]here was not enough information . . . just based on the anonymous tip I got from [the section 8 contact]." Defendant initially refused to consent to a search of his van, the carport area, or his apartment, and told police they needed to get a warrant. Police asked "him to let us conduct our follow up investigation," and defendant ultimately gave permission to search the van. Police found a box of live .40 caliber ammunition in the van.

Defendant told them to stop searching, and the officers arrested him for possession of the ammunition.

After defendant was arrested, the officers searched defendant and his backpack. They found a loaded .40 caliber handgun in the backpack. Detective Vang had previously conducted a records check and learned defendant had two firearms registered to him, but not the one they found in his backpack.

A videotape of Officer Gray's body camera recording was admitted at the hearing. The transcript of the recording indicates that after defendant refused to consent to a search of the apartment, the officers repeated five times over the course of a few minutes that they would "get out of [his] hair" and twice that they would "[s]top ruining [his] day" if he would consent to a

4

search. The officer then asked, in regard to the van, "I can go in here?" Defendant responded "Yes, you may man." Defendant then stated he would "rather you guys get a warrant but uh. You know what I mean." The officer responded "We appreciate you uh, just being cooperative. [¶] . . . [¶] [T]hen we can get out of here, because it's hot as hell out here right now. Am I right?" Defendant responded "Yes, it is." The officer then said "All right," and defendant responded "Yes, Sir." Based on the time stamp on the transcript of the body camera recording, the time from when police first approached defendant and when he consented to the search of the van was a little over 9 minutes.

The court, sitting as a magistrate, concluded defendant was not initially detained and consented to the search of his van. It further concluded that following the discovery of the ammunition, defendant was properly arrested and the search of his person and backpack was lawful incident to arrest.

Defendant subsequently filed a section 995 motion to set aside the information, again challenging the search. The superior court concluded the magistrate "got it wrong" and defendant was "most clearly detained. The officer just walked up without any basis and demanded to search him." The court denied the motion, however, concluding "there was sufficient attenuation from that point [(the asserted detention)] to [defendant's] consent to allow search of the van."

" '[T]he voluntariness of . . . consent is in every case "a question of fact to be determined in the light of all the circumstances." [Citations.]' [Citations.] Accordingly, the trial court's findings on this issue, either express or implied, must be upheld on appeal if they are supported by substantial evidence. All presumptions favor the proper exercise of the trial

5

court's power to judge the credibility of witnesses, resolve conflicts, weigh evidence, and draw factual inferences." (*People v. Llamas* (1991) 235 Cal.App.3d 441, 447.) "The prosecution bears the burden of showing that the consent to a search is voluntary and unaffected by duress or coercion. [Citations.] In every case, the voluntariness of a consent is a factual question to be decided in light of all the circumstances. [Citation.] The trial court's findings, on the issue of consent, whether express or implied, will be upheld on appeal if supported by substantial evidence." (*People v. Aguilar* (1996) 48 Cal.App.4th 632, 639.)

The "following factors are relevant to whether consent is voluntary: [¶] (a) Whether the person consenting was in custody. [¶] (b) Whether the arresting officers had their guns drawn. [¶] (c) Whether *Miranda*[5] warnings had been given. [¶] (d) Whether the person consenting was told that he or she had a right not to consent. [¶] (e) Whether the person consenting was told that a search warrant could be obtained. [¶] Even if a defendant is under arrest at the time of the search, that does not preclude a finding that his or her consent to the search was voluntary. (*United States v. Watson* (1976) 423 U.S. 411 . . . [consent was freely given following defendant's warrantless arrest; custody alone is not enough in itself to demonstrate coercion]; *People v. Fischer* (1957) 49 Cal.2d 442, 448 . . . [consent given while under arrest is not involuntary as matter of law]; *People v. Monterroso* (2004) 34 Cal.4th 743, 758 . . . [when consent to search was sought and given, defendant (1) had been arrested, (2) was in handcuffs, (3) had not been given *Miranda* warnings, and (4) had not been informed of right to withhold consent; these are factors to be considered, but did not preclude finding that consent was voluntary].)" (*People v. Arter* (2017) 19 Cal.App.5th Supp. 1, 6–7.)

---

5 *Miranda v. Arizona* (1966) 384 U.S. 436.

Defendant asserts his consent to the search of the van was "presumptively involuntary" because he was assertedly illegally detained and pat searched, citing *People v. $48,715 United States Currency* (1997) 58 Cal.App.4th 1507 (*United States Currency*).

While the court in *United States Currency* did observe that a search following an unlawful detention may be "tainted," the case does not assist defendant here. To the contrary, it supports the denial of his motions.

In *United States Currency,* the claimant in a forfeiture proceeding appealed from a summary judgment of forfeiture on the ground his motion to suppress should have been granted and, had it been, the government could not have established probable cause that the disputed cash was forfeitable. (*United States Currency, supra*, 58 Cal.4th at p. 1510.) The claimant was a passenger in a pickup truck that was so overloaded an axle buckled and it became disabled on the freeway. (*Ibid.*) When a tow truck arrived, the driver of the pickup asked if the pickup could be repaired immediately, stating he would pay double the price, so the men could return to Mexico. (*Ibid.*) The tow truck driver became suspicious and asked his dispatch to call the sheriff's department. (*Ibid.*)

When an officer arrived, he told the driver of the pickup he suspected there were narcotics in the truck. The driver, the only occupant who spoke English well enough to communicate with the officer and who translated for the passengers, gave the officer permission to search the pickup. (*United States Currency, supra*, 58 Cal.4th at pp. 1510–1511.) Because the bed of the truck was full, the officer asked if the men would " 'mind sitting in the back of [his] car.' " (*Id.* at p. 1511.) The officer also asked if he could search all three men for weapons, to which they agreed. (*Ibid.*)

7

After "inspecting the pickup further," the officer decided a canine search would be "more expeditious." (*United States Currency, supra*, 58 Cal.4th at p. 1511.) Again, the three men consented to the search and said they " 'didn't mind waiting.' " (*Ibid.*) After the dog arrived, the officer handling the canine decided it was too dangerous to search the pickup on the freeway, so he asked for and received permission to move it to a truck stop a few miles away. The men agreed. (*Ibid.*)

The dog subsequently "alerted" to a seed bag and two suitcases, but police found "nothing of interest" inside. (*United States Currency, supra*, 58 Cal.4th at p. 1511.) The dog then alerted to the "sides of the truck bed." (*Ibid.*) The officers saw bundles they thought contained drugs. On further inspection, the officers discovered they contained cash. (*Ibid.*)

One of the officers asked the claimant if he would allow the search to be continued and the truck to be transported "to the sheriff's substation for a more thorough search," and he agreed. (*United States Currency, supra*, 58 Cal.4th at p. 1511.) Once at the substation, a deputy told the men they were not in custody and would not be arrested. (*Ibid.*) Defendant said $30,000 of the cash was his, to be used to purchase a tractor. (*Id.* at p. 1512.)

The People returned the pickup truck but instituted forfeiture proceedings as to the cash. (*United States Currency, supra*, 58 Cal.4th at p. 1512.) The trial court granted the People's motion for summary judgment. (*Ibid.*) The court first found the driver had given permission for the search, but he and the two passengers, including the claimant, were subsequently unlawfully detained so the continued search and discovery of the cash was "tainted." (*Ibid.*) Nevertheless, the court found the original consent "was of sufficient scope" to embrace the resumed searches and therefore the seizure of the cash was lawful. (*Ibid.*)

8

The Court of Appeal affirmed, rejecting the claimant's argument that his unlawful detention terminated the previously given consent to search the pickup. "In the present case, there was no initial, fruitless search. The search to which the driver consented had not yet occurred, and there is no reason to believe it *would not* have occurred if appellant, driver and third passenger had not been detained. The purported detention of [defendant] and his companions (whether lawful or unlawful) did not, as a factual matter, lead to the search that recovered the currency. The absence of any factual nexus between the search and the purported detention leads us to conclude that the detention, even if unlawful, did not terminate the consent to search. . . ." (*United States Currency, supra*, 58 Cal.4th at p. 1514.)

The court also rejected the claimant's "proposed analogy to illegal detentions that *precede* the challenged consent to search. It is precisely the causal connection between the illegal detention and the ensuing consent that results in suppression. . . : '[I]t is axiomatic that a consent to search *produced by* an illegal arrest or detention is not voluntary.' " (*United States Currency, supra*, 58 Cal.4th at p. 1514.) However, "[w]here subsequent events adequately dispel the coercive taint of the initial illegality—i.e., where there is no longer causality—the subsequent consent is given full effect." (*Ibid.*)

The Court of Appeal thus concluded that even if the men in the truck had been unlawfully detained, that did not terminate the driver's earlier consent or the continued consent to the ensuing searches of the pickup.[6] (*United States Currency, supra*, 58 Cal.4th at pp. 1514–1515.)

---

[6] The Court of Appeal also affirmed the trial court's denial of the claimant's motion for return of the cash on the ground the government failed to establish probable cause that the cash was forfeitable. (*United States*

9

So too here. Regardless of whether the initial detention and pat search of defendant was improper, there was no evidence the pat search was the cause of defendant's subsequent consent to the search of his van. The officers found no evidence during the initial pat search, and after that search, defendant was not placed under arrest. The officers then asked for consent to search defendant's apartment, which he refused. This demonstrated both that he understood he could refuse to consent to a search and that he had the ability to, and did, express refusal. The officers then spoke with defendant for about six minutes, in, as the trial court found, a "friendly" manner, noting defendant was "free to stand and walk around." Over the course of about two minutes, the officers told defendant they would "get out of [his] hair" if he would just consent to a search. Defendant said he would prefer they have a warrant, but then consented to a search of the van. His comment about a warrant again indicated he knew he could refuse consent and require the police to obtain a warrant. In short, there was abundant evidence that there was no causal connection between the initial detention, assuming it was such, and pat search and the consent defendant later gave to search his van.

Defendant also maintains the officers' repeated comments that they would "get out of [his] hair" if he consented to the search were, in and of themselves, coercive. He claims the officers "conducted themselves in a manner that ultimately overcame [his] will." As we have recited, the comments about getting "out of [his] hair" if defendant would consent to a search occurred over about a two-minute time period. He was not detained during the conversation. The officers spoke with him in a friendly manner, and he continued sitting in the carport and drinking his beverage. Under

_Currency, supra_, 58 Cal.4th at p. 1510.) This aspect of the case has no bearing on the issue before us.

these circumstances, the officers' statements they would "get out of [his] hair" if defendant consented to the search were not coercive.[7]

### *The North Carolina "Strike" Conviction*

The prosecutor alleged in the third amended information that defendant had been convicted of two prior "strikes," assault with a deadly weapon in 1997 and second degree murder in 2006, both in North Carolina.

Defendant claims his second degree murder conviction did not qualify as a "strike" conviction under California law because "the definition of malice aforethought in North Carolina is broader than the definition used in California and includes acts that would not amount to malice aforethought under California law." Specifically, defendant identifies the North Carolina theory of " 'deadly weapon implied malice' " (underscoring omitted) as sufficient to support second degree murder under North Carolina law—a theory he claims lacks all the requisite aspects of implied malice under California law to support a second degree murder conviction.

"Under our sentencing laws, foreign convictions may qualify as serious felonies, with all the attendant consequences for sentencing, if they satisfy certain conditions. . . . For an out-of-state conviction to render a criminal offender eligible for sentencing under the three strikes law (§§ 667, subds. (b)–(i), 1170.12), the foreign crime (1) must be such that, 'if committed in California, [it would be] punishable by imprisonment in the state prison' (§§ 667, subd. (d)(2), 1170.12, subd. (b)(2)), and (2) must 'include[ ] all of the elements of the particular felony as defined in' section 1192.7(c) (§§ 667, subd.

---

[7] Because we conclude defendant's consent to the search of his van was voluntary, we do not reach his claims that the search incident to his arrest for the ammunition was the "fruit of the poisonous tree." (*Wong Sun v. United States* (1963) 371 U.S. 471, 487–488.)

11

(d)(2), 1170.12, subd. (b)(2)).” (*People v. Warner* (2006) 39 Cal.4th 548, 552–553.)

Under California law, “ ‘ “[s]econd degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.” ’ ” (*People v. Johnson* (2019) 32 Cal.App.5th 26, 41–42.)

Malice may be express or implied. “(1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [¶] (3) Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.” (§ 188, subd. (a)(1)–(3).) “If it is shown that the killing resulted from an intentional act with express or implied malice, as defined in subdivision (a), no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite that awareness is included within the definition of malice.” (*Id.*, subd. (b).)

A “conviction for second degree murder, based on a theory of implied malice, requires proof that a defendant acted with conscious disregard of the danger to human life.” (*People v. Knoller* (2007) 41 Cal.4th 139, 156 (*Knoller*).) “Malice is implied when the killing is proximately caused by ‘ “an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who *knows that his conduct endangers the*

*life of another and who acts with conscious disregard for life.*" ' [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Id.* at p. 143, italics added.)

Second degree murder in North Carolina is defined as " '(1) the unlawful killing, (2) of another human being, (3) with malice, but (4) without premeditation and deliberation.' " (*State v. Arrington* (2018) 371 N.C. 518, 523 (*Arrington*).)

"Malice may be shown in at least three different ways: (1) actual malice, meaning 'hatred, ill-will or spite'; (2) an inherently dangerous act 'done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief'; or (3) ' "that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification." ' " (*Arrington*, *supra*, 371 N.C. at p. 523.)

"[D]eadly weapon implied malice theory . . . falls into the third malice category." (*State v. Lail* (N.C. Ct.App. 2016) 251 N.C.App. 463, 473.) "It is this third kind of malice which is proved as a matter of law when the state proves the intentional infliction of a wound with a deadly weapon which results in death and there is no evidence of mitigation, justification or excuse." (*State v. Reynolds* (1982) 307 N.C. 184, 191.) "However, deadly weapon implied malice is 'not a conclusive, irrebuttable presumption.' [Citation.] . . . [T]he mandatory presumption of deadly weapon malice [is] converted to a permissible inference when the defendant present[s] 'evidence concerning the reason for which, manner in which, and circumstances under which he used' the deadly weapon." (*Lail,* at p. 474, citing *State v. Debiase* (2011) 211 N.C.App. 497, 509–510.)

13

Focusing on deadly weapon implied malice, defendant maintains a defendant can be found guilty of second degree murder under North Carolina law without a finding of "the mens rea required in California to prove either express or implied malice aforethought." (Underscoring & boldface omitted.) He asserts the "North Carolina definition of deadly weapon implied malice totally omits two additional mens rea elements required in California . . . 1) at the time he acted, the defendant knew his act was dangerous to human life; and, 2) the defendant deliberately acted with conscious disregard for human life." (Underscoring omitted.)

The Attorney General maintains there is, in fact, a "similar concept" of implied malice under California law. He asserts there is a presumption of malice where there is an "assault with a deadly weapon resulting in death," citing *People v. McAuliffe* (1957) 154 Cal.App.2d 332 (*McAuliffe*) and *People v. Lewis* (1969) 1 Cal.App.3d 698 (*Lewis*).[8]

The issue in *McAuliffe* was whether the court erred in reducing defendant's conviction from first to second degree murder. The defendant claimed the homicide was justifiable as self-defense, while the Attorney General maintained the homicide was first degree murder. (*McAuliffe, supra,* 154 Cal.App.2d at pp. 334, 344.) *McAuliffe* stated the general rule that " 'When an unlawful assault is made with a deadly weapon upon the person

---

8 In the trial court, the prosecutor advanced a different argument. He conceded that "Defense Counsel is correct that there may be theories of liability under which a person can commit a second degree murder in North Carolina that would not constitute a second degree murder in California." But he maintained that "consideration of those situations under the least adjudicated elements test only occurs if the record of conviction does not define the conduct undertaken by the Defendant. In this case, the conduct is evidenced in the record." The prosecutor appears to have been mistaken, as neither party has cited to any part of the record that evidences the conduct of the defendant.

14

of another, resulting in death, and the assault is not provoked or perpetrated in necessary self-defense, or in the heat of passion, malice may be presumed.' " (*Id.* at p. 338.) In *Lewis*, the court explained assault with a dangerous weapon must be "made *in a manner endangering life* and resulting in death [in order] to sustain a conviction of second degree murder. Malice is implied from the assault." (*Lewis*, *supra*, 1 Cal.App.3d at p. 701, italics added.)

The Attorney General also maintains that, as in North Carolina, "the [California] presumption is not conclusive. Ultimately the manner of the assault and the circumstances under which it was made determine whether the natural consequences of the conduct is dangerous to life," citing *People v. Guillen* (2014) 227 Cal.App.4th 934, 985 (*Guillen*).

However, more recent cases from our high court, including those cited in *Guillen*, have clarified the implied malice necessary for second degree murder. "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Knoller*, *supra*, 41 Cal.4th at p. 143.) *Guillen,* itself, contains no discussion of a presumption of malice based on an assault with a deadly weapon. *Guillen* did, however, reiterate the requirements for implied malice necessary for second degree murder. *Guillen* explained, " ' "The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' " ' " (*Guillen, supra*, 227 Cal.App.4th at p. 984, quoting *People* v. *Chun* (2009) 45 Cal.4th 1172, 1181.)

15

In contrast, in North Carolina, second degree murder can be committed where the defendant intentionally inflicts "a wound with a deadly weapon which results in death and there is no evidence of mitigation, justification or excuse," without any requirement that the defendant knew his or her act was dangerous to human life and acted in conscious disregard for life. (*State v. Reynolds*, *supra*, 307 N.C. at p. 191.)

Thus, we agree with defendant that theoretically a defendant may be convicted of second degree murder in North Carolina for conduct that would not constitute second degree murder in California.

We also agree with defendant that the record in this case does not establish that defendant was not convicted of second degree murder in North Carolina on the basis of such conduct.

"In considering whether the prior conviction constitutes a strike, 'the court may look to the entire record of the conviction to determine the substance of the prior foreign conviction; but when the record does not disclose any of the facts of the offense actually committed, the court will presume that the prior conviction was for the least offense punishable under the foreign law.' " (*People v. Roberts* (2011) 195 Cal.App.4th 1106, 1116–1117.) "In determining whether the foreign prior contains the elements of the California felony, the trier of fact may not look outside the record of conviction, but may consider any evidence in the record of the foreign conviction 'if not precluded by the rules of evidence or other statutory limitation[s].' " (*People v. Johnson* (2019) 32 Cal.App.5th 26, 48–49.)

The evidence in the record of the North Carolina conviction includes the grand jury indictment, the "Transcript of Plea" form, and the "Judgment and Commitment" form. The indictment alleged defendant "unlawfully, willfully and feloniously and of malice aforethought kill[ed] and murder[ed]

16

[the victim.]"  The transcript of plea form indicates defendant pled guilty to second degree murder "as part of a plea agreement" and agreed "there are facts to support [the] plea" and he was "in fact guilty."  The "Judgment and Commitment" indicates the court sentenced defendant to a minimum term of 140 months and a maximum of 177 months.

In short, the North Carolina record of conviction does not reveal on what theory of malice the conviction was based.  And the minimum elements of that conviction could have been based on a deadly weapon implied malice theory that did not require defendant to know " ' "his [or her] conduct endangers the life of another and . . . acts with conscious disregard for life." ' " (*Knoller*, *supra*, 41 Cal.4th at p. 143.)  As the court in *People v. Carothers* (2017) 13 Cal.App.5th 459, stated, "The question for us . . . is not whether the Texas jury found each element of a California implied malice murder was satisfied, but whether the crime revealed by the record of conviction, if committed in California, would have been a murder under our Penal Code.  The record of conviction is too sparse for us to answer that question in the affirmative." (*Id*. at pp. 467–468.)

But as the Attorney General goes on to point out, even assuming defendant's conduct underlying his North Carolina second degree murder conviction embraced only that required for deadly weapon implied malice, *that* conduct constitutes assault with a deadly weapon under California law (§§ 240, 245, subd. (a)(1)) which *is* a strike offense.  (§ 1192.7, subd. (c)(23), (31).)

"The crime of assault with a deadly weapon has two components:  '(1) the assault, and (2) the means by which the assault is committed.' " (*In re Raymundo M*. (2020) 52 Cal.App.5th 78, 85.)  "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the

17

person of another." (§ 240.)  To commit an assault, the defendant must attempt an act that, if successful, " 'will probably and directly result in injury to another.' " (*People v. Wyatt* (2010) 48 Cal.4th 776, 780.)  As we have discussed, a defendant who commits second degree murder in North Carolina under a deadly weapon implied malice theory necessarily has committed an "assault" with "a deadly weapon."

Section 667, subdivision (d)(2) requires only that the out-of-state crime be "for an offense that includes all of the elements of a particular violent felony as defined in subdivision (c) of Section 667.5 or serious felony as defined in subdivision (c) of Section 1192.7" and would be punishable by imprisonment in the state prison, not necessarily for the same crime.

In *People v. Maldonado* (1986) 186 Cal.App.3d 863, for example, after concluding the minimum elements of murder under Texan law did not include all the elements of murder under California law, the court considered whether the "minimum elements of the [Texas] conviction constitute[d] the serious felony of 'any other felony in which the defendant inflicts great bodily injury on any person.' " (*Id.* at p. 866.)  The *Maldonado* court concluded it did not.  But, as we have discussed, conduct constituting second degree murder in North Carolina under a deadly weapon implied malice theory, *does* constitute another serious felony under California law, namely assault with a deadly weapon.

In *People v. Fox* (2001) 93 Cal.App.4th 394 (*Fox*), the defendant appealed from a strike sentence based on an Oregon conviction for second degree rape, defined as sexual intercourse with a minor under the age of 14. (*Id.* at p. 396.)  Unlike section 288, subdivision (a), which criminalizes lewd acts on a child under the age of 14, the Oregon courts ruled, after the defendant was sentenced, that Oregon's second degree rape law does not

require any specific sexual intent.  (*Fox,* at pp. 396–397.)  The defendant therefore argued on appeal from his strike sentence that his Oregon second degree rape conviction was not the equivalent of a conviction under section 288, subdivision (a) and therefore did not qualify as a strike offense.  (*Fox,* at p. 397.)  While the Court of Appeal agreed that the defendant's Oregon conviction did not qualify as a serious felony under section 288, subdivision (a), it concluded his conduct did qualify as a strike under section 1192.7, subdivision (c)(6), which includes within its list of serious felonies any " 'lewd or lascivious act on a child under the age of 14 years' " and has no sexual intent requirement.  (*Fox,* at pp. 398–399.)  As the court explained, the defendant's Oregon conviction for child rape was based on conduct that, under California law, was "a lewd and lascivious act regardless of intent." (*Id.* at p. 399.)  The court therefore affirmed the defendant's strike sentence— "[a]lthough the trial court erroneously based its finding that defendant's prior Oregon conviction was a strike on the theory that the prior met all the elements contained in section 288, the trial court's ultimate ruling was correct."  (*Ibid.*)

Defendant does not take issue with the substance of the Attorney General's argument that regardless of whether his North Carolina second-degree murder conviction constitutes second degree murder under California law, it does constitute the strike offense of assault with a deadly weapon.

Rather, defendant claims this point has been "forfeited" because "the prosecutor failed to assert it in the superior court," citing to *People v. Jenkins* (2000) 22 Cal.4th 900, 1000 (*Jenkins*).  What *Jenkins* says is that " ' "[a]n appellate court will ordinarily not consider procedural defects or erroneous rulings [in connection with relief sought or defenses asserted], where an objection could have been, but was not presented to the lower court by some

19

appropriate method." ' " (*Ibid.*) In other words, *Jenkins* recites the usual waiver or forfeiture of error rule applicable to an appellant. The Attorney General, however, prevailed in the trial court.

What *Jenkins* does not say is that, as a respondent, the People will forfeit the right to argue that a judgment is correct for a reason other than that given by the trial court if the People failed to proffer such an alternative rationale in the trial court. As has been often stated, "[o]ur task is to review the trial court's ruling, not its reasoning. ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " [9] (*People v. Turner* (2020) 10 Cal.5th 786, 807, quoting *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19, italics omitted.) Indeed, the court in *Fox* invoked this principle to uphold the defendant's strike sentence on the ground it was legally correct, despite the trial court's erroneous reasoning. (*Fox, supra,* 93 Cal.App.4th at p. 399.)

We therefore uphold defendant's second-strike sentencing, albeit for a reason different than that stated by the trial court.

### Consecutive Sentencing

Defendant lastly maintains the trial court failed to realize it had the discretion to sentence him to concurrent, rather than consecutive, terms under section 667, subdivision (c)(6).

---

[9] Defendant also asserts the Attorney General "cited no legal authority that would support" his alternative argument. That, however, is not the case; he cited to the relevant provisions of the Penal Code pertaining to assault with a deadly weapon.

Section 667 provides in relevant part: "Notwithstanding any other law, if a defendant has been convicted of a felony and it has been pled and proved that the defendant has one or more prior serious or violent felony convictions as defined in subdivision (d), the court shall adhere to each of the following: [¶] . . . [¶] If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to subdivision (e)." (§ 667, subd. (c)(6).)

" ' "[C]onsecutive sentences are not mandatory [under the Three Strikes law] if the multiple current felony convictions are 'committed on the same occasion' or 'aris[e] from the same set of operative facts.' " ' " (*People v. Hojnowski* (2014) 228 Cal.App.4th 794, 800, quoting *People v. Deloza* (1998) 18 Cal.4th 585, 591 (*Deloza*); *People v. Koback* (2019) 36 Cal.App.5th 912, 927 ["the trial court has discretion to impose concurrent sentences if it concludes the current convictions were committed on the same occasion or did arise from the same operative facts"].)

As this court recently explained, in *Hendrix,* "the high court addressed whether, under section 667, subdivision (c)(6) and (7), a trial court has discretion to impose concurrent sentences in cases where ' "there is a current conviction for more than one  serious or violent felony." ' " (*People v. Torres* (2018) 23 Cal.App.5th 185, 197–198 (*Torres*), quoting *People v. Hendrix* (1997) 16 Cal.4th 508, 512, fn. 4 (*Hendrix*)[10].)

---

[10]  The issue of whether the Three Strikes law requires consecutive terms on multiple current violent or serious felony convictions, regardless of whether the offenses occurred on the same occasion or arose from the same set of operative facts, is currently before our high court. (*People v. Henderson* (2020) 272 Cal.Rptr.3d 812, 477 P.3d 537.)  The issue does not pertain to this case, as "[a] conviction of possession of a firearm by a felon is neither a

"The court first considered the language of section 667, subdivision (c)(6), which provides: ' "If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to subdivision (e)." ' (*Hendrix, supra,* 16 Cal.4th at p. 512, quoting § 667, subd. (c)(6).) 'By its terms,' said the court, 'this subdivision applies to any current felony conviction.' (*Hendrix,* at p. 512.) 'Moreover, subdivision (c)(6) clearly provides that consecutive sentencing is mandatory for any current felony convictions "not committed on the same occasion, and not arising from the same set of operative facts." ' (*Ibid.*, quoting § 667, subd. (c)(6).) 'By implication,' then, said the court, 'consecutive sentences are not mandatory under subdivision (c)(6) if the multiple current felony convictions are "committed on the same occasion" or "aris[e] from the same set of operative facts" ' (*Hendrix,* at pp. 512–513), and a trial court retains discretion to impose concurrent sentences so long as consecutive sentencing is not mandated by another statute. . . ." (*Torres, supra,* 23 Cal.App.5th at p. 198, italics omitted.)

" 'The phrase "committed on the same occasion" is commonly understood to refer to at least a close temporal and spatial proximity between two events. . . .' " (*People v. Lawrence* (2000) 24 Cal.4th 219, 229, quoting *Deloza, supra,* 18 Cal.4th at p. 594.) "Nothing in either the language of [the three strikes law's mandatory consecutive-sentencing provision] or its legislative history suggests the electorate intended these words," "same occasion," "to have a special or peculiar import different from their ordinary, generally understood meaning." (*Deloza,* at p. 594.)

---

serious nor a violent felony. (§§ 667.5, subd. (c), 1192.7, subd. (c).)" (*People v. Byers* (2020) 53 Cal.App.5th 1106, 1110.)

Here, the prosecutor disagreed with the recommendation of the probation department that the sentences on the firearm and ammunition possession charges run concurrently. The probation report stated, "the possession of the ammunition is a separate act from the possession of the firearm, but occurred so close in time and place as to indicate a single period of aberrant behavior."

The prosecutor maintained "there is an error in the probation report in that the Probation Department ignored Penal Code Section 667(c)(6), which finds that if two crimes are committed, and they are not arising from the same set of operative facts and circumstances, that those crimes must be sentenced consecutively. [¶] These are two separate charges for which the defendant is convicted and they are not arising from the same set of operative facts as they do not share common acts or criminal conduct that serves to establish the same elements of the offenses. The ammunition the defendant was in possession of was separate from the ammunition that was contained inside the firearm."

The court then asked the prosecutor "in light of your request that the Court sentence the defendant to 50 years to life [(two consecutive 25-year sentences)] . . . [i]s your position that there is no, I guess, I'll use the word discretion, but to run the ammunition concurrent [*sic*] in light of what probation recommends? [¶] And I agree with you, . . . they are of the mind that it is essentially one course of conduct. I certainly see how you would essentially say it's two different events, but assuming what probation suggests is true, is the Court nevertheless required to make it 50 to life?"

The prosecutor responded "I think that the Court is in a position where, if it does not Romero the strike, based upon Penal Code Section 667(c)(6), . . . the Court needs to make a finding, essentially, as to whether or not the two

23

charges arise from the same occasion or set of operative facts. If the Court makes the determination that they do not and strikes are imposed, it is the People's position that consecutive sentences are mandatory."

The court acknowledged it had the "ability and discretion to strike strikes . . . it deems appropriate," but denied a *Romero* motion.

As to whether the sentences would run consecutively, the court stated "[a]lthough it may seem harsh to you, certainly I don't think the request by the People is out of line. I think it is in fact correct. . . . Ammunition and a gun are apples and oranges. It is not one operative set of facts, it's two, two different events. [¶] . . . I agree, as I mentioned, with the People's analysis that they're two distinct challenges here, two operative set[s] of facts, and because of that, the Court is going to impose what [defendant] would suggest is a very harsh and unjust sentence, but it's the correct one in my view. . . ."

What this colloquy reflects is that prosecutor several times told the court that if defendant's convictions *either* did not arise from the same occasion *or* did not arise from the same set of operative facts, consecutive sentences were mandatory, when in fact, if *either* was true, the court had discretion to impose concurrent sentences. The trial court, in turn, appears to have been persuaded by the prosecutor's seeming misstatement as to the court's sentencing options, since the court focused *solely* on whether the two convictions arose from the same set of operative facts and did not consider whether the crimes were committed on the same occasion.

"Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing. [Citations.] Defendants are entitled to 'sentencing decisions made in the exercise of the "informed

discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.)

Since the record here does not demonstrate that the trial court was aware of the full scope of its discretion, we remand for the court to exercise its discretion as to whether the sentences will run concurrently or consecutively.

## DISPOSITION

The matter is remanded for the trial court to exercise its discretion as to whether the sentences for unlawful possession of a firearm and unlawful possession of ammunition shall run concurrently or consecutively.  In all other respects, the judgment is affirmed.

                              _____

                              Banke, J.

We concur:

_____

Humes, P.J.

_____

Margulies, J.

A164249, People v. Phouamkha